# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                Cr. No. 05-1274 JCH

JIM HOGAN,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Jim Hogan's Motion to Suppress Physical Evidence and Statements and Memorandum of Law, filed July 26, 2005 **[Doc. No. 47]**. On October 6, 2005, and December 8, 2005, the Court held evidentiary hearings on the motion. Defendant was present at both hearings and was represented by Jerry Daniel Herrera, Esq.  The United States was represented by Assistant United States Attorney Elaine Ramirez.  After considering the evidence presented at the hearings, along with the arguments of counsel, written briefs, and applicable law, the Court concludes that the motion should be granted.

## FINDINGS OF FACT

Based upon the evidence presented at the hearings, the Court makes the following findings of fact.

On May 18, 2005, at 9:04 p.m., an "On-Star" call center operator contacted the Bernalillo County Sheriff's Office (BCSO) and informed BCSO dispatch that the emergency button had been activated in a silver Cadillac Escalade, in the vicinity of Prosperity and Broadway SE in

Albuquerque.  Although the operator could hear someone, who sounded like a child, in the vehicle, the operator could not make contact with the person.  The name on the Escalade On-Star account was Alfredo Ibarra.

BCSO dispatched three units to the approximate vicinity of the Escalade.  Sergeant Robert Tyler, the highest ranking officer on the scene, was in command of the first unit, Deputy Miguel Rivas, an officer in training, drove the second unit, while Deputy Ryan Tafoya, a field training officer, sat in the passenger seat, and Deputies Boltman and Littlefield, one officer in training and one field training officer, occupied the third unit.  All three vehicles were marked field units, and the officers were dressed in full uniform.

The officers searching for the Escalade were unaware of the nature of the emergency.  Based upon their experience, the officers realized the emergency could have involved the theft of the vehicle.  The officers noted, while searching for the Escalade, that all of the businesses in the area of Prosperity and Broadway were closed and customarily are closed by 9:00 p.m.  There were no street lamps or sidewalks in the area, and it was extremely dark outside.

At approximately 9:18 p.m., Sergeant Tyler located the Escalade.  Sergeant Tyler had been traveling in his vehicle east on Prosperity, just past Broadway, when he observed the Escalade in a fenced-in yard to the north (his left).  The yard was part of a mechanic or autobody shop called Hills Automotive located at 4330 Broadway, SE.  A chain-link fence prevented Sergeant Tyler from entering the yard from Prosperity, so Sergeant Tyler parked his vehicle on Prosperity and walked towards the fence separating him from the Escalade.  Sergeant Tyler observed a subject, later determined to be Defendant Alfredo Ibarra, near the Escalade.  Sergeant Tyler made contact with Mr. Ibarra, who informed Sergeant Tyler that his son was locked in the

2

Escalade and had activated the On-Star system.  Sergeant Tyler asked Mr. Ibarra to inform him

how to access the premises of the business so that he could assist Mr. Ibarra, and Mr. Ibarra

provided Sergeant Tyler with directions.  Sergeant Tyler, in turn, relayed this information to the

other officers.

To access Hills Automotive, Sergeant Tyler turned his vehicle around and proceeded west

on Prosperity, and then turned north (right) onto a dirt road.  From there, Sergeant Tyler drove

through the main gate of the business.  On his approach, Sergeant Tyler noticed that the business

appeared closed.  Other than the people with whom Sergeant Tyler was speaking, there was no

movement in the area and the doors to the business were closed.

Hills Automotive consists of a rectangular outdoor area, the length of which runs north-

south, and a rectangular building, the length of which also runs north-south.  The building is

adjacent and to the east of the parking lot.  The front of the building, which faces west, has

numerous large bay garage doors down its length.  On the night in question, the outdoor area was

filled with numerous parked vehicles.  The entrance to the parking lot of the business is located on

the northwest side of the premises.

Upon entering the parking lot of Hills Automotive, Sergeant Tyler parked his vehicle to

the east, facing the front of the north side of the building.  Sergeant Tyler estimated that he

stopped his vehicle fifteen or twenty feet away from, and to the north of, what was later

determined to be Defendant Jim Hogan's 1998 Dodge pickup truck.  A photograph entered into

evidence at the hearing indicates that the front bumper of Sergeant Tyler's vehicle was located

just north of the front bumper of Mr. Hogan's truck.  Further north and to the left of Sergeant

Tyler's vehicle, was an open area, free of cars or obstruction, approximately twenty to twenty-five

feet wide.

When Sergeant Tyler entered the premises, Mr. Hogan's pickup truck was positioned on an angle, with the tail of the truck near the bay doors of the building, pointing southeast (slightly more to the east), and the front of the truck facing away from the building, pointing northwest (slightly more to the west). The tail of Mr. Hogan's vehicle was between ten to twelve feet from the front of the building.

As the vehicles were positioned, Sergeant Tyler's vehicle partially blocked Mr. Hogan's truck, so that for Mr. Hogan to exit the business, he would have been required to back his truck up one or more times towards the building, and then steer his truck around Sergeant's Tyler's vehicle. Sergeant Tyler did not park his vehicle next to the Escalade, which was on the south end of the parking area, but rather approximately 200 feet away from the Escalade towards the north end of the parking area.

Approximately twenty seconds after Sergeant Tyler drove onto the premises of Hills Automotive, Deputies Rivas and Tafoya followed Sergeant Tyler into the business and parked their police unit behind Sergeant Tyler's vehicle. Almost immediately thereafter, Deputies Boltman and Littlefield drove onto the premises and parked their police unit slightly ahead of, and to the north of, Deputies Rivas and Tafoya's vehicle.

Mr. Hogan testified that when Sergeant Tyler pulled into the business, Mr. Hogan had just started to drive his truck forward, with the intention of leaving the business, but that he stopped his vehicle when he saw the first police unit pull into the yard. Sergeant Tyler testified that he saw Mr. Hogan when he arrived on scene, but that he could not recollect whether Mr. Hogan was in his vehicle with the engine running. The Court finds Mr. Hogan's testimony credible and

therefore finds that Mr. Hogan was in his truck with the engine running when Sergeant Tyler arrived.  The Court further finds that it is likely that Mr. Hogan's truck was stationary when Sergeant Tyler first noticed it.

When Sergeant Tyler exited his vehicle and started walking toward the Escalade, Mr. Hogan testified that he asked Sergeant Tyler whether he could leave, and Sergeant Tyler responded, "No.  Not [un]til[] we get things sorted out."  Sergeant Tyler testified that he didn't "believe" he spoke to and didn't "recall" speaking to Mr. Hogan before proceeding to the Escalade.  The Court finds Mr. Hogan's testimony with respect to whether Sergeant Tyler instructed him to remain on the premises to be credible.  First, Sergeant Tyler could not recall certain aspects of what happened when he arrived on the scene.  For example, Sergeant Tyler testified that he could not recall whether he saw Mr. Hogan inside or outside of the truck and that he could not recall whether the engine of Mr. Hogan's truck was running.  Sergeant Tyler also admitted during his testimony that his attention was focused on the Escalade and not, he claimed, Mr. Hogan or his vehicle.  Second, Sergeant Tyler seems to be unsure of certain facts.  For example, Sergeant Tyler testified initially that he "could have seen" Mr. Hogan but later admitted that he did in fact see Mr. Hogan.  In addition, Sergeant Tyler testified initially that he "didn't" talk to Mr. Hogan then later testified that he didn't "believe" he spoke to Mr. Hogan and later still that he didn't "recall" talking to Mr. Hogan.  Unlike Sergeant Tyler, Mr. Hogan had a clear recollection of the events surrounding Sergeant Tyler's arrival onto the premises.  The Court also believes, based upon Mr. Hogan's testimony, that Mr. Hogan wanted and was intending to leave the premises of Hills Automotive, and that he would have done so but for some show of authority from the police indicating that he could not leave.  Accordingly, the Court finds that Sergeant

Tyler did in fact instruct Mr. Hogan to remain on the premises.[1]

After Sergeant Tyler instructed him to remain on the premises, Mr. Hogan turned the engine of his truck off and stepped out of his truck without being asked to do so. According to Mr. Hogan, another officer walked up to his truck, an officer whom Mr. Hogan believed to be Deputy Tafoya, and remained by Mr. Hogan's side throughout the entire evening. Deputy Tafoya testified that he was with Mr. Hogan for only part of the evening, and that when he walked away from Mr. Hogan, another deputy positioned himself by Mr. Hogan. According to Deputy Tafoya, there was a police officer standing by Mr. Hogan during the whole series of events that night. The Court finds Deputy Tafoya's testimony credible.

While Deputy Tafoya was stationed next to Mr. Hogan, Mr. Hogan testified that he asked Deputy Tafoya whether he could leave, and that Deputy Tafoya informed Mr. Hogan that he could not leave until things were sorted out. Mr. Hogan further testified that he asked Deputy Tafoya whether he could get his Skoll out of his truck, and that Deputy Tafoya responded in the negative. In contrast, Deputy Tafoya testified that he did not hear Mr. Hogan tell him or anyone else that he wanted to leave the premises. Deputy Tafoya also testified that he at no point told Mr. Hogan that he could not leave the premises.

After instructing Mr. Hogan to stay on the premises, Sergeant Tyler proceeded to the

---

[1] The Court notes that Deputy Tafoya testified that he saw Sergeant Tyler walking out of his vehicle and up to the Escalade, and that he did not see Sergeant Tyler having a conversation with Mr. Hogan. Deputy Rivas likewise saw Sergeant Tyler walk out of his car and up to the Escalade, and did not see or hear Sergeant Tyler have a conversation with any individual near the Dodge pickup truck. Both Deputies Tafoya and Rivas testified, however, that they did not notice Mr. Hogan or Mr. Hogan's vehicle immediately upon their arrival at the scene. In addition, Deputies Tafoya and Rivas arrived approximately twenty seconds after Sergeant Tyler. Accordingly, the Court finds that Deputies Tafoya and Rivas may have missed any exchange between Sergeant Tyler and Mr. Hogan.

Escalade, which was located approximately 200 feet to the south of Sergeant Tyler's car on the other side of the property, and attempted to persuade the child inside of the car to unlock the doors. It took Sergeant Tyler from 9:18 p.m. to 9:20 p.m. to arrive from Prosperity, on the other side of the chain link fence, to the Escalade on the premises of Hills Automotive. Deputy Rivas, as well as Deputies Boltman and Littlefield, accompanied Sergeant Tyler to the Escalade. When it became clear that the child would not be able to unlock the doors, Sergeant Tyler radioed dispatch, using his own police radio, and requested that On-Star unlock the Escalade's doors. On-Star complied with the request. Sergeant Tyler spent approximately fifteen minutes talking to Mr. Ibarra by the Escalade.

Approximately ten minutes after On-Star unlocked the doors, the child's mother arrived on the scene and took the child home. The child's mother had no difficulty accessing the property. No deputies' vehicles were blocking the entrance or exit to the property. Sergeant Tyler testified that during this time anyone was free to come and go, and that the child's mother had no difficulty entering and exiting the premises. Although Mr. Hogan testified that he did not see the child's mother enter or exit the property, he did not dispute that the child's mother did in fact pick the child up.

During this time period, while Sergeant Tyler was on the other side of the property by the Escalade, Deputy Tafoya approached Sergeant Tyler at the Escalade to inform him that he had found a subject, later determined to be Defendant Eric Aniles, hiding in a vehicle on the premises. After speaking to Sergeant Tyler, Deputy Tafoya spoke with Mr. Hogan about the hiding subject. Mr. Hogan informed him that the subject had given him a ride to the property to pick up his truck, which Mr. Hogan claimed had just had an oil change and routine service. Mr. Hogan also told

7

Sergeant Tyler that he was at Hills Automotive to pick up his vehicle, which had just received an

oil change, and that the hiding subject had brought him from his hotel to Hills Automotive.  Mr.

Hogan also indicated that Mr. Ibarra and Defendant Sean Daly, an employee of Hills Automotive

who also was on the premises that night, had sent Mr. Aniles to pick up Mr. Hogan.

Mr. Aniles did not speak English.  Deputy Rivas spoke to Mr. Aniles in Spanish.  Mr.

Aniles informed Deputy Rivas that he was on the premises waiting for a friend by the name of

Juan to have his vehicle repaired.  Sergeant Tyler asked Mr. Ibarra about the identity of the

subject, and Mr. Ibarra indicated that he did not know the subject.  Mr. Daly likewise indicated

that he did not know the identity of the subject.

Sergeant Tyler also asked Mr. Ibarra the reason for his presence on the property.  Mr.

Ibarra indicated that he was working on another automobile.  There were several other vehicles

on the property, including a stripped Escalade, which belonged to Mr. Ibarra.

Sergeant Tyler's suspicions were raised by the hiding subject.  Sergeant Tyler felt that no

one was giving an honest answer as to why he was on the premises or whom he knew.  Sergeant

Tyler's suspicions were further raised by the stripped Escalade.

Sergeant Tyler wanted to conduct an NCIC check by radio on the stripped Escalade.

Sergeant Tyler testified that the battery on his radio was dying because he had worked two shifts

and was going into a third shift and had not had time to recharge the battery.  NCIC checks,

Sergeant Tyler further testified, typically are done by computer or telephone.  Sergeant Tyler

chose not to walk back to his police cruiser and conduct the NCIC check on his computer.  He

also chose not to conduct the NCIC check through one of the radios of the other deputies.

Instead, Sergeant Tyler requested permission from Mr. Daly to use a telephone.  The evidence

8

indicates and the Court finds that Sergeant Tyler attempted to gain access to the building as an investigative technique.  Sergeant Tyler, however, did not admit during his testimony that he was attempting to gain access to the building but rather only claimed that he needed to use the business's telephone because the batteries on his radio were dying.  The Court finds that Sergeant Tyler could have conducted the NCIC check the way he testified NCIC checks typically are conducted, through the computer on board his police unit.  Alternatively, he could have requested that one of the other deputies on the premises conduct the NCIC check on their radios.

Pursuant to Sergeant Tyler's request, Mr. Daly opened one of the garage door bays to allow Sergeant Tyler to use a telephone inside of the building.  Sergeant Tyler walked through the open bay door and followed Mr. Daly to a telephone.  After he completed the call, which, according to Mr. Hogan took approximately fifteen minutes, Sergeant Tyler began to walk towards the open bay door to exit the building.  On his way out, Sergeant Tyler could see inside the other bays of the building, and he observed a trailer in one of those bays.  Sergeant Tyler testified that he noticed the trailer because he had a trailer just like it, and that he informed Mr. Daly of this fact.  Sergeant Tyler lit up the trailer with his flashlight and noticed that there were some bugs on the front of the trailer.

According to Sergeant Tyler, the trailer was "littered" with bugs, "like it had been traveling for quite some time."  Sergeant Tyler asked Mr. Daly whether the trailer was one of his customers, and Mr. Daly responded in the affirmative.  Sergeant Tyler then asked whether it belonged to anyone on the premises.  Mr. Daly responded in the negative.  Sergeant Tyler testified that he also noticed that Mr. Hogan's truck was covered with bugs and that the bugs on his truck were the "exact same bugs" as those on the trailer, as if the two had been traveling

9

together.

Sergeant Tyler, upon exiting the building, approached Mr. Hogan, who was standing near his pickup truck.  Sergeant Tyler did not have a discussion with Mr. Hogan, but rather simply asked Mr. Hogan when he was going to pick up his trailer.  Mr. Hogan indicated that he would pick it up the following morning.  This answer was directly contrary to the information Sergeant Tyler previously had received from Mr. Daly about the ownership of the trailer, and the contradiction further aroused Sergeant Tyler's suspicions.  Sergeant Tyler then asked Mr. Daly why he had lied about the ownership of the trailer, and Mr. Daly responded by saying he didn't know what was in the trailer.

Sergeant Tyler testified that he, with Deputy Sheldahl, requested permission from Mr. Hogan to search the trailer.  Sergeant Tyler testified that he presented Mr. Hogan with two consent forms, one for Mr. Hogan's pickup truck and the other for the trailer.  Sergeant Tyler testified that Deputy Sheldahl reviewed the forms with Mr. Hogan.  Deputies Sheldahl and Tafoya both testified that Mr. Hogan did not indicate that he had any difficulty understanding or reading the forms.  Deputy Sheldahl further testified that he advised Mr. Hogan that he had a right to refuse consent to search before Mr. Hogan signed the forms, and that Mr. Hogan's response to the advisement was to sign the forms.  The evidence indicates that the forms were signed at 10:32 p.m.  Deputy Tafoya observed Mr. Hogan signing one of the two consent forms, and according to Deputy Tafoya, Mr. Hogan did not object to signing the form.  Sergeant Tyler also testified that Mr. Hogan did not object or say no to the search but merely indicated that he was hauling antique tools.

After Mr. Hogan signed the consent forms at 10:32 p.m., Deputy Sheldahl testified that

10

Sergeant Tyler and he looked at the trailer and realized it was locked.  The officers asked Mr. Hogan for the keys to the trailer, which Mr. Hogan provided.  Although Mr. Hogan indicated one key on a ring of keys opened the trailer, he was incorrect.  The officers found another key on the ring that opened the trailer.  Sergeant Tyler and Deputy Sheldahl unlocked the padlock and opened the door of the trailer.  When the officers opened the trailer door, they saw what appeared, based upon their experience and training, and what was later confirmed, to be marijuana.

At 10:34 p.m., two minutes after Mr. Hogan signed the consent forms, Sergeant Tyler called the Criminal Investigations Division to have the division take over the investigation.  Sergeant Tyler testified that either at the arrival or prior to the arrival of Criminal Investigations Division, Sergeant Tyler searched Mr. Hogan's truck and located marijuana inside of a luggage bag inside of the truck.

Mr. Hogan's testimony regarding the search of this truck and trailer contradicts the testimony of the other officers, but is more consistent with the time frame of events.  Mr. Hogan testified that he did not give specific permission to the officers to search the trailer, but that he did give them specific permission to search his truck.  Mr. Hogan testified that the officers, pursuant to his permission, opened the doors of his truck and looked inside of the truck.  In response to the request from Sergeant Tyler to look inside of his trailer, Mr. Hogan testified that he said, "Well, what if I said no?"  According to Mr. Hogan, Sergeant Tyler replied, "Well, we're going to look in it anyway."  Mr. Hogan then stated, "Well, it doesn't look like I have a choice," and Sergeant Tyler answered, "No.  We'll cut the lock and look in it."  According to Mr. Hogan, Sergeant Tyler or Deputy Tafoya acquired the keys to the locked trailer by opening his truck door and

11

taking the keys out of truck.  Apparently, the keys were hanging out of the ashtray and illuminated by the dome light in the truck.  Once the officers had the keys, Mr. Hogan testified that they asked him, "Which key is it?," to which Mr. Hogan responded by identifying a key.  The officers then went inside of the building while an officer remained by Mr. Hogan.  When the officers exited the building, Mr. Hogan testified that Sergeant Tyler placed him under arrest.  According to Mr. Hogan, the officers were in the building for fifteen or twenty minutes.

After the officers exited the building, Mr. Hogan testified that the officers brought him two written consent forms, laid the forms on the top of the hood of his truck, and told him that he needed to sign the forms.  According to Mr. Hogan, the officers informed him that he needed to sign the forms because they had looked inside of his trailer.  Mr. Hogan testified that he had difficulty reading the forms because of the poor lighting in the area and because he did not have his reading glasses.  Mr. Hogan testified that he informed the officers that he could not sign the forms because he did not his glasses with him.  Sergeant Tyler was within earshot of the conversation and claimed that he did not hear Mr. Hogan say that he did not have his glasses.  Sergeant Tyler admitted, however, that it was possible that Mr. Hogan could has said such a comment.  Mr. Hogan testified that he was not advised that he had the right to refuse to sign the forms.  Mr. Hogan further testified that he did not feel like he had any option other than signing the forms.

Under the officers' version of events, the Court would have to conclude that the officers spent one hour and twelve minutes of their time accomplishing the following:  arriving on the premises, heading to the Escalade, speaking to Mr. Ibarra and attempting to free the child, allowing the child's mother to pick the child up, finding the hiding subject, questioning the people

12

on the premises regarding the hiding subject and their relationship to each other, conducting an NCIC check, observing the trailer inside of the building, questioning Mr. Daly and Mr. Hogan about the trailer, obtaining Mr. Hogan's consent to search the trailer, and reviewing the written consent forms, which were signed at 10:32 p.m., with Mr. Hogan.  Then, under the officers' version of events, they accomplished all of the following in two minutes, before they placed a 10:34 p.m. call to the Criminal Investigations Division:  walking into the building to open the trailer after obtaining Mr. Hogan's written consent, noticing that the trailer was locked, walking back outside of the building to ask Mr. Hogan for the keys, obtaining the keys from Mr. Hogan, locating the correct key, opening the trailer, ascertaining that the trailer contained bags of marijuana, and arresting Mr. Hogan.  In contrast, under Mr. Hogan's version of events, during that same two minute period, the only events that occurred were Mr. Hogan's signature on the documents at 10:32 p.m., Mr. Hogan's subsequent arrest, and then the 10:34 p.m. telephone call to the Criminal Investigations Division.

Once the marijuana was discovered, the officers sought and obtained a search warrant, and the trailer, truck, and buildings were further searched.  Over 1780 pounds of marijuana were recovered from the trailer.  A small amount of cash and firearms also were found, as well as some scales located inside the business.

The officers also recovered a bag of marijuana from an overnight duffel bag found in Mr. Hogan's truck.  The duffel bag contained Mr. Hogan's personal items.  Mr. Hogan testified that he did not put the marijuana in his duffel bag but did not testify how the marijuana appeared in his bag.  The Court does not find Mr. Hogan's denial of his ownership of the marijuana credible.  The Court further finds that Mr. Hogan's testimony regarding the marijuana places in question the

13

veracity of Mr. Hogan's other testimony.

The parties do not dispute that TFO Chavez read Mr. Hogan his *Miranda* rights and that Mr. Hogan agreed to waive his *Miranda* rights and provide TFO Chavez with a statement.  Mr. Hogan made both pre- and post-arrest statements.  The details of those statements were not placed into evidence at the hearing.

The government charged Mr. Hogan with conspiracy to possess with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 846 and possession with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  On July 26, 2005, Mr. Hogan filed a motion to suppress the physical evidence and statements purportedly made by him.

## <u>DISCUSSION</u>

Defendant makes several arguments in support of his motion to suppress.  First, Defendant claims that he was detained in violation of the Fourth Amendment.  Second, Defendant claims that the officers conducted the warrantless search of his trailer without his valid and voluntary consent in violation of the Fourth Amendment.  Third, Defendant claims that the officers gained entry into the interior of Hills Automotive in violation of the Fourth Amendment.  Finally, Defendant argues that the officers did not timely provide him with his *Miranda* warnings.  The Court will address each of these arguments in turn.

I.      Unlawful Detention in Violation of the Fourth Amendment

      A.      Unlawful Detention

Defendant maintains that he was seized in violation of the Fourth Amendment.[2]  The

Tenth Circuit repeatedly has recognized that there are "three categories of police-citizen

encounters:  (1) consensual encounters which do not implicate the Fourth Amendment; (2)

investigative detentions which are Fourth Amendment seizures of limited scope and duration and

must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most

intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause."

*United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999) (citation and internal quotations

omitted).

      The seizure of a person occurs, and the Fourth Amendment is implicated, "when [an]

officer by means of physical force or show of authority has in some way restrained the liberty of a

citizen."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  In determining whether a police-citizen

encounter is consensual, "the crucial test is whether, taking into account all of the circumstances

surrounding the encounter, the police conduct would have communicated to a reasonable person

that he was not at liberty to ignore the police presence and go about his business."  *Florida v.

Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988);

*see also Hill*, 199 F.3d at 1147.  During a consensual encounter, an officer is not required to

inform a suspect that he does not have to respond to questioning or that he is free to leave.

*United States v. Manjarrez*, 348 F.3d 881, 886 (10th Cir.2003); *United States v. Patten*, 183 F.3d

_____

     [2] The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. Amend. IV.

1190, 1194 (10th Cir.1999).  The appropriate inquiry is not whether a particular defendant felt free to leave, but rather whether a reasonable person "would feel free to decline the officer's requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436.  The reasonable person test "presupposes an innocent person" so the inquiry is not what a reasonable person carrying contraband would do in response to the inquiry. *Id.* "No *per se* or absolute rules govern the inquiry into whether an encounter is consensual. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Rather, every case turns on the totality of the circumstances presented. *Hill*, 199 F.3d at 1147.

Here, Sergeant Tyler and the other deputies arrived in response to the On-Star advisement.  Mr. Hogan was in his truck, which was running, and was attempting to leave the premises when Sergeant Tyler drove his unit onto the premises and parked his marked police unit approximately fifteen to twenty feet to from Mr. Hogan's vehicle.  Approximately twenty seconds after Sergeant Tyler drove onto the premises, Deputies Rivas and Tafoya drove onto the premises and parked their marked police unit behind Sergeant Tyler's vehicle.  Almost immediately thereafter, Deputies Boltman and Littlefield drove onto the premises and parked their marked police unit slightly ahead of, and to the north of, Deputies Rivas and Tafoya's vehicle.  As the vehicles were positioned, Sergeant Tyler's police unit partially blocked Mr. Hogan's truck, so that for Mr. Hogan to exit the business, he would have been required to back his truck up one or more times towards the building, and then steer his truck around Sergeant's Tyler's vehicle as well as the two other police vehicles.  Upon exiting his automobile, Sergeant Tyler, in full uniform, began to head 200 feet to the south towards the Escalade.  Mr. Hogan asked Sergeant Tyler whether he could leave, and Sergeant Tyler responded, "No.  Not [un]til[] we get things sorted out."  Deputy Rivas, in full uniform, followed Sergeant Tyler to the Escalade.  Deputies Boltman and Littlefield,

16

also presumably in full uniform, accompanied Sergeant Tyler to the Escalade.  Deputy Tafoya, in

full uniform, walked toward Mr. Hogan's truck, and stationed himself by Mr. Hogan's side.

At this point, the Court believes that a reasonable person in Mr. Hogan's position would

not have felt at liberty to ignore the police presence of five uniformed officers in three marked

police vehicles and leave the premises, particularly when one of the officers instructed him to

remain and his car was partially blocked by a marked police vehicle.  *Cf. id.*  Taking into account

all of these circumstances, the Court concludes that Sergeant Tyler and the deputies, by show of

authority, restrained Mr. Hogan's liberty, thereby seizing him.  *Cf. Terry*, 392 U.S. at 19 n.16.

The government argues that even if Mr. Hogan was seized, the seizure did not violate Mr.

Hogan's constitutional rights because it was based upon a reasonable, articulable suspicion that

criminal activity may be afoot.  Under the Fourth Amendment, a police officer can stop and briefly

detain a person for investigative purposes--*i.e.*, conduct an investigative detention--if the officer

has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.  *See

Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).  Reasonable suspicion is one that would

"warrant a man of reasonable caution and belief that a stop was appropriate.  *Terry*, 392 U.S. at

22.  The law does not specify a "minimum number of factors necessary to constitute reasonable

suspicion or any outcome determinative criteria."  *United States v. Lopez-Martinez*, 25 F.3d

1481, 1484 (10th Cir. 1994).  In determining whether an officer has reasonable suspicion

justifying a detention, courts must examine the totality of the circumstances.  Reasonable

suspicion may exist even if "each of the [] actors alone is susceptible of innocent explanation."

*United States v. Arvizu*, 534 U.S. 266, 273 (2002).  In assessing the justification for an

investigatory stop, courts must look to the collective knowledge of all the police involved in the

17

criminal investigation. *See, e.g.*, *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003); *United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir. 1997).

In this case, the deputies received information from On-Star that there was an emergency activation inside of a Cadillac Escalade. On-Star advised the deputies that it was unable to make contact with anyone inside of the vehicle, but that sounds of a child could be heard over the line. The deputies were dispatched to a remote area, at approximately 9:00 p.m., where all the businesses were closed. Sergeant Tyler located the Escalade in what appeared to be a closed business and spoke to Mr. Ibarra, who informed Sergeant Tyler that his child was locked in the Escalade and had activated the On-Star emergency call button. Mr. Ibarra directed Sergeant Tyler to the entrance of the business. Sergeant Tyler entered the business, followed by Deputies Tafoya and Rivas and Boltman and Littlefield.

At the time Sergeant Tyler entered the premises of Hills Automotive, the only factors within his knowledge that would have contributed to a suspicion that criminal activity was afoot were the late hour, the remote location, the fact that the subjects were the only persons present in an area where all of the business, including Hills Automotive, were closed, and the fact that an On-Star emergency activation had occurred as a result of a child being locked inside of the Escalade. These factors are not sufficient to warrant a reasonable officer to believe that criminal activity was afoot and that a stop was appropriate. *Cf. Terry*, 392 U.S. at 22. The government maintains in its brief that the conflicting stories by everyone at the business also supported the officers' reasonable suspicion of criminal activity. At the time Mr. Hogan initially was seized, however, the officers had not yet learned of the conflicting stories or the hiding subject on the premises. Accordingly, these admittedly suspicious circumstances do not support Mr. Hogan's

initial detention.

      B.      <u>Validity of the Consent to Search</u>

In light of the Court's finding that Mr. Hogan was seized in violation of the Fourth Amendment, the Court turns to the issue whether the search of the trailer nevertheless was justified by Mr. Hogan's alleged consent. The Court notes that Mr. Hogan, in his motion to suppress, claims that his consent was not voluntary given. The Court need not resolve whether Mr. Hogan's consent was voluntary at this stage, however, because if the consent was tainted by the unlawful detention, that consent is invalid and the fruits of the consent must be suppressed regardless of the voluntariness of the consent. The Court therefore determines first whether the unlawful detention tainted the alleged consent.

The Tenth Circuit has held that a search preceded by a Fourth Amendment violation still may be valid if the defendant's consent to search "was voluntary in fact under the totality of the circumstances." *United States v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001) (internal quotations and citation omitted).   If the consent is not sufficiently an act of free will to purge the primary taint of the illegal arrest, it must be suppressed as fruit of the poisonous tree. *See Brown v. Illinois*, 422 U.S. 590, 601 (1975). "When there has been such a violation, the government bears the heavy burden of showing that the primary taint of that violation was purged." *Caro*, 248 F.3d at 1247. "To satisfy this burden, 'the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent.' " *Id.* (citing *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir.1996)) (internal quotations omitted). Although no single fact is dispositive, the Supreme Court has provided three factors that are especially relevant to determining whether a consent is

tainted by a preceding illegal search or seizure:  (1) the temporal proximity of the illegal detention

and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official

misconduct.  *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *United States v. Melendez-Garcia*,

28 F.3d 1046, 1054 (10th Cir. 1994).

With respect to applying the first *Brown* factor, the temporal proximity of the illegal

detention and consent, the Court notes that Mr. Hogan initially was detained at approximately

9:20 p.m., and that he signed the written consent forms at 10:32 p.m., approximately one hour

and ten minutes later.  Courts have held that consent obtained just minutes after a Fourth

Amendment violation is too close in temporal proximity to an illegal detention to render the

consent voluntary.  *See United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994) (holding

that consent was not voluntary when obtained "only a few minutes" after the illegal seizure);

*United States v. Fernandez*, 18 F.3d 874, 883 (10th Cir. 1994) (holding that consent was not

voluntary when "only moments" elapsed between illegal detention and seizure).  The Tenth

Circuit also has held that a written consent form signed forty-five minutes after an illegal seizure is

nonetheless tainted by the seizure because of close proximity of the unlawful seizure and the

consent.  *United States v. Maez*, 872 F.2d 1444, 1455 (10th Cir. 1989).  *Compare Brown*, 422

U.S. at 604-05 (temporal proximity not sufficient to purge taint where first statement was

separated from illegal arrest by less than two hours).   Here, the consent was signed one hour and

ten minutes after the unlawful detention.  Although the detention is longer than that in *Maez*, the

Court notes that Mr. Hogan was still on the premises of Hills Automotive and remained there by

his truck during the entire one hour and ten minute time period.  *See id.* (noting that the subject

was still on the premises where the unlawful detention had occurred as part of the inquiry into the

first *Brown* factor).  The Court further notes that a uniformed officer was stationed by Mr. Hogan during this entire time period.  The unlawful detention therefore continued during that entire one hour and ten minute period.  Accordingly, the Court finds that the temporal proximity of the unlawful seizure and the consent was not sufficient to purge the taint of the unlawful detention.

"In applying the second factor in *Brown*, [a court] look[s] only from the defendant's perspective in determining whether any intervening event occurred which isolates the defendant from the coercive effects of the original illegal stop so as to render his subsequent consent voluntary in fact." *Gregory*, 79 F.3d at 980.  "For consent obtained subsequent to an illegal detention to be voluntary in fact, there must be proof of facts or events which ensure that the consent provided by the defendant is truly voluntary and not the fruit of the illegal stop.  The facts or events must create a discontinuity between the illegal stop and the consent such that the original illegality is weakened and attenuated." *Id.*  "Although not prerequisites, in determining whether consent is voluntary when given following [a Fourth Amendment violation], we look at such factors as whether the officer informed the defendant that he was free to leave the scene or that he could refuse to give consent." *Id.* at 979; *see also McSwain*, 29 F.3d at 563 ("[the defendant's] consent was not sufficiently an act of free will to purge the primary taint of the illegal detention, observing that though [the officer's] return of [the defendant's] identification and the vehicle registration may be a factor indicating that [the defendant] was free to leave, [the officer] failed to specifically inform [the defendant] that he was free to leave the scene or that he could refuse to give his consent") (internal quotation marks and citations omitted).

Here, the Court cannot say that the facts or events ensure that the consent provided by Mr. Hogan was truly voluntary and not the fruit of the illegal stop or that they create a

21

discontinuity between the illegal stop and the consent weakening the original illegality.  *Cf.*

*Gregory*, 79 F.3d at 980.  Mr. Hogan, once initially detained at approximately 9:20 p.m., was left

standing on the premises with an officer in full uniform stationed by his side during the entire one

hour and ten minute period between his initial detention and subsequent signature on the written

consent forms.  During that time, he was questioned by the officers about Mr. Aniles and the

trailer.  No officer informed Mr. Hogan that he was free to leave.  Although Deputy Sheldahl

testified that he informed Mr. Hogan that he could refuse consent, that one factor, in light of the

other facts and circumstances surrounding the unlawful detention, was not sufficient to create a

discontinuity between the illegal stop and the consent.  *Cf. Maez*,  872 F.2d at 1455 (noting that

advice of the right to refuse consent is probative, it is not dispositive, and finding that the taint

was not purged even though officers advised subject of her right to refuse consent) (citing

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 249 (1973)); *Fernandez*, 18 F.3d at 882 n.8

(citing cases in which consent did not purge taint of illegal police actions even though individuals

were informed of right to refuse consent); *McSwain*, 29 F.3d at 563 ("just because an officer

informs an individual of the right to refuse consent does not necessarily mean the individual's

consent will be voluntary in fact").

      With respect to the third *Brown* factor, we must examine the purpose and flagrancy of the

official misconduct.  Based upon his testimony, Sergeant Tyler describes critical facts as a serious

of coincidences.  He says that he just happened to park 200 feet away from the Escalade when he

was dispatched for the purpose of assisting individuals in or near the Escalade; that he just

happened to partially block Mr. Hogan's truck when he parked his police cruiser; that the

batteries on his police radio just happened to be running low; that he just happened to chose to

use to telephone in the business instead of his on-board computer or another officer's radio; that

he just happened to own the same trailer as Mr. Hogan; and that the bugs on the outside of the

trailer just happened to be the "exact same bugs" on Mr. Hogan's truck.  The record suggests,

however, that these circumstances were not mere coincidences and that Sergeant Tyler's actions

were purposeful investigative techniques.[3]  Sergeant Tyler's behavior suggests that he detained

Mr. Hogan "with a quality of purposefulness." *Brown*, 422 U.S. at 605 ("[t]he arrest, both in

design and in execution, was investigatory"; "[t]he detectives embarked upon this expedition for

evidence in the hope that something might turn up"); *cf. Fernandez*, 18 F.3d at 883 (finding

"quality of purposefulness" because officer detained driver based "solely on a tension in the air

and his vague hunch that something was afoot, with the hope that something might turn up")

(internal quotations omitted); *United States v. Peters*, 10 F.3d 1517, 1523 (10th Cir. 1993)

(finding flagrant misconduct where agent stopped a vehicle "solely on an unsupported,

inarticulable 'hunch'" supplied by another officer who previously had stopped and searched the

vehicle and found no evidence of drugs or illegal activity).  The record also indicates that

Sergeant Tyler was "embarking upon a fishing expedition in the hope that something might turn

up." *Brown*, 422 U.S. at 605.  The Court therefore concludes that the purpose and flagrancy of

Sergeant Tyler's conduct weighs against finding the taint purged.

Under the totality of the circumstances, and with special emphasis on the three *Brown*

factors, the Court concludes that there was not "a sufficient attenuation or break in the causal

connection between the illegal detention and the consent." *Caro*, 248 F.3d at 1247 (internal

---

[3] The Court does not mean to deter officers from using legal investigative tactics in an effort to bring criminal activity to light.  The Court simply notes that the record indicates that Sergeant Tyler's actions were purposeful and coincidental.

quotation marks omitted).  Thus, the government failed to meet its heavy burden of proving that Mr. Hogan's alleged consent to search the trailer was untainted by the Fourth Amendment violation.  As such, the consent to search was not voluntary and the fruits of that consent should be suppressed.

C.      Mr. Hogan's Statements

In his motion to suppress, Mr. Hogan asks the Court also to suppress the statements purportedly made by him.  In *Wong Sun v. United States*, 371 U.S. 471 (1963), the Supreme Court pronounced the principles to be applied in determining whether statements and other evidence obtained after an illegal arrest or search should be excluded.  The Court stated, "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'  *Wong Sun*, 371 U.S. at 487-88 (quoting Maguire, Evidence of Guilt, 221 (1959)).  In *Wong Sun*, the Court suppressed one defendant's statement because the statement did not result from "'an intervening independent act of a free will,'" and because it was not "sufficiently an act of free will to purge the primary taint of the unlawful invasion."  *Id.* at 486.  With respect to the other defendant's confession, however, the Court held that in the light of his lawful arraignment and release on his own recognizance, and of his return voluntarily several days later to make the statement, the connection between his unlawful arrest and the statement "had 'become so attenuated as to dissipate the taint.'"  *Id.* at 491.

24

"The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case.  No single fact is dispositive."  422 U.S. at 603.  "The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest.  But they are not the only factor to be considered.  The temporal proximity of the arrest and the confession, the presence of intervening circumstances, *see Johnson  v. Louisiana*,  406 U.S. 356, 365 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant.  *See Wong Sun*, 371 U.S. at 491."  *Id.* at 603-04 (internal footnotes omitted).  "The voluntariness of the statement is a threshold requirement.  *Cf.* 18 U.S.C. § 3501.  And the burden of showing admissibility rests, of course, on the prosecution."  *Id.* at 604 (internal footnote omitted).

For the same reasons stated above, *see supra* § I.B, the Court concludes that Mr. Hogan's statements were not sufficient acts of free will to purge the primary taint of the unlawful detention.  The fact that Mr. Hogan was read his *Miranda* warnings does not change the Court's opinion.  *Cf. id.* at 603-04.  Because the government has not satisfied its burden of demonstrating that the taint of the unlawful seizure was purged, the Court suppresses Mr. Hogan's statements.

II.    Remaining Arguments.

Because the Court grants Defendant's motion to suppress on the ground that the officers detained Defendant in violation of the Fourth Amendment, and that the consent given was tainted by the unlawful detention, the Court need not address Defendant's remaining arguments.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Defendant Jim Hogan's Motion to Suppress

Physical Evidence and Statements and Memorandum of Law, filed July 26, 2005 **[Doc. No. 47]** is

hereby GRANTED.


Dated this 14th day of April 2006.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE